**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRESNO MOTORS, LLC, a California limited liability company and SELMA MOTORS, INC., a California corporation, *Plaintiffs-Appellants*, <br><br> v. <br><br> MERCEDES BENZ USA, LLC, a Delaware limited liability company, *Defendant-Appellee*. | No. 12-15981 <br><br> D.C. No. 1:11-CV-02000-CJC <br><br><br> OPINION |

On Appeal from the United States District Court
for the Eastern District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
January 17, 2014—San Francisco, California

Filed November 5, 2014

Before: J. Clifford Wallace, Jay S. Bybee, Circuit Judges,
and Robert W. Gettleman, District Judge.*

Opinion by Judge Gettleman

---

* The Honorable Robert W. Gettleman, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

## SUMMARY**

### California Law

The panel affirmed in part, and reversed in part, the district court's summary judgment entered in favor of Mercedes-Benz USA, LLC in a diversity action brought by plaintiffs whose attempt to purchase a Fresno Mercedes-Benz dealership was unsuccessful due to Mercedes-Benz's exercise of a right of first refusal.

Applying California law, the panel affirmed the district court and held that the plaintiffs had no claims for intentional interference with contract or prospective economic advantage where Mercedes-Benz timely and lawfully exercised its right of first refusal ("ROFR"). The panel also held that California Vehicle Code § 11713.3(t)(2) did not require a franchisor to send notice of the intent to exercise a ROFR to the prospective transferee. The panel further held that even if plaintiffs were entitled to notice from Mercedes-Benz of its exercise of the ROFR, the notice plaintiffs received was both timely and in proper form.

Mercedes-Benz and the existing franchisee entered into an acknowledgment agreement which set out the parties' rights and obligations with respect to Mercedes-Benz's exercise of its ROFR. The panel affirmed the district court, and held that plaintiffs' claim that Mercedes-Benz fraudulently concealed the existence of the acknowledgment agreement had no merit.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

California Vehicle Code § 11713.3(t)(6) provides for a proposed transferee's right to recover its expenses from a franchisor that usurps its contract by exercising a ROFR. The panel concluded that the plaintiffs, as prospective transferees, had an implied right of action under section 11713.3(t)(6), and reversed the summary judgment to Mercedes-Benz on that count, and remanded for further proceedings.

Finally, the panel affirmed the district court's grant of summary judgment to Mercedes-Benz on plaintiffs' claim under the California Unfair Competition Statute.

---

### COUNSEL

Alexander F. Stuart (argued) and Ellyn E. Nesbit, Willoughby, Stuart & Bening, San Jose, California; Oliver W. Wagner, Wagner Jones Helsley, P.C., Fresno, California, for Plaintiffs-Appellants.

Gwen J. Young (argued) and Ryan P. Day, Wheeler, Trigg, O'Donnell LLP, Denver, Colorado, for Defendant-Appellee.

---

### OPINION

GETTLEMAN, District Judge:

Plaintiffs Fresno Motors, LLC ("Fresno") and Selma Motors, Inc. ("Selma") (jointly, "plaintiffs") signed an Asset Purchase Agreement to purchase a Mercedes-Benz dealership from Asbury Fresno Imports, LLC ("Asbury"). Mercedes-Benz USA, LLC ("MB"), the manufacturer/importer of the vehicles sold by the dealership, exercised a right of first

refusal ("ROFR") contained in its dealership agreement with Asbury. After several unsuccessful attempts to resolve plaintiffs' objections to MB's exercise of its ROFR, plaintiffs brought this action contesting the timeliness and propriety of that exercise.

In a first amended complaint ("FAC") plaintiffs assert five claims against MB, all brought under California law: (1) intentional interference with existing contractual advantage; (2) intentional interference with prospective economic advantage; (3) violation of California Business and Professions Code § 17200; (4) violation of California Vehicle Code § 17133.3(t); and (5) fraudulent concealment. MB moved to dismiss the FAC under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Because all operative facts appeared to be agreed, the district court converted the motion to one for summary judgment under Fed. R. Civ. P. 12(d) and 56, and allowed the parties to file supplemental briefs and additional evidence if needed. In a March 27, 2012, comprehensive opinion, the court granted defendants summary judgment on all claims. Plaintiffs timely appealed.

## I.

Asbury owned and operated the Fresno Dealership pursuant to a Passenger Car Dealer Agreement ("PCDA") and Light Truck Dealer Agreement ("LTDA") (jointly, "Dealer Agreement") with MB. It operated the dealership on premises that it leased from CAR AAG CA L.L.C. (the "Landlord") under an April 1, 2003, Lease Agreement ("Lease") with a fifteen year term and two ten-year renewal options.

In fall 2008, Selma, owned by Dwight G. Nelson, began negotiating with Asbury for the purchase of the Fresno

Dealership. Selma and Asbury executed an initial Asset Purchase Agreement on December 11, 2008. At that time Selma began working with MB to become approved as a Mercedes-Benz dealer, and submitted a completed Dealer Application Packet on December 28, 2008. Selma and Asbury mutually terminated the initial agreement on January 16, 2009.

On March 27, 2009, Selma and Asbury executed a second Asset Purchase Agreement ("APA"). MB sent Selma a second dealer application, but on April 3, 2009, Selma informed MB that all of the requested information was in the original package. MB requested that Selma confirm that all information in the original package remained current, and on April 14 Selma responded by sending MB updated information including a Commitment Letter covering the floor plan financing for the proposed dealership, which Mercedes-Benz Financial confirmed as valid. On April 20, 2009, Selma sent MB a "Wholesale Financing Commitment Form" executed by Mercedes-Benz Financial.

On April 23, 2009, Nelson formed Fresno for the sole purpose of buying the Fresno Dealership from Asbury. The following day, Selma (through Nelson) informed MB that it intended to assign the APA to Fresno. On April 30, 2009, MB informed Nelson that because Fresno was the purchasing entity it was critical that MB receive a Wholesale Financing Commitment Form from Mercedes-Benz Financial reflecting Fresno as the buyer.

On May 1, 2009, Selma, Asbury and Fresno executed a second amendment to the APA, completing the assignment to Fresno. That amendment assigned to Fresno all of Selma's rights under the APA, but specifically indicated that it was

not intended to operate as release of Selma's obligations. That same day, Fresno (through Nelson) sent to MB by facsimile and overnight mail the Wholesale Financing Commitment Form signed by Mercedes-Benz Financial evidencing its commitment to extend floor plan financing to Fresno.

Exactly forty-five days later, on June 15, 2009, at 8:18 p.m. EDT (5:18 Pacific Time), MB exercised its contractual ROFR. MB provided notice to Asbury by sending it a letter by email and facsimile. Although not contractually required to do so, MB also sent a copy of the letter to Nelson's personal email address and to the email address of Fresno's comptroller, Charles Fletcher. MB also sent the letter by facsimile to a fax machine at Nelson's business address at Selma Motors. The letter indicates that it was also sent via overnight delivery, but apparently was not placed with Federal Express until the following day, and then delivered on June 17, 2009.

On June 19, 2009, MB and Asbury entered into an agreement (the "Acknowledgment Agreement"), which states that "[o]n June 15, 2009, MB provided timely written notice to Asbury of its exercise of its right of first refusal with respect to the . . . Fresno Motors APA . . . ." The Acknowledgment Agreement then expressly set out the parties' rights and obligations with respect to MB's exercise of its right of first refusal. In particular, the Agreement provides:

> 1. *Terms of Exercise.* MB acknowledges that by its exercise of its right of first refusal, MB will be subject to the same terms and conditions under the Fresno Motors APA as

such terms and conditions apply to Fresno Motors. Further, any subsequent assignment by MB of its rights or obligations under any or all of the Fresno Motors APA and Purchase Documents, including, without limitation, the Sublease, shall not operate as a release of MB of its obligations under such Agreements. For avoidance of doubt, MB expressly agrees that it shall be primarily responsible for the performance under the Fresno Motors APA and Sublease. Asbury acknowledges that MB may assign its rights and obligations under the Fresno Motors APA and the Sublease to a third party provided that MB remain primarily responsible for the performance of any such assignee with respect to the Fresno Motors APA and the Sublease.

The Acknowledgment Agreement also provides that Asbury would terminate the Fresno APA with respect to Fresno Motors, but that the termination would "not be deemed a termination of the Fresno Motors APA as such terms and conditions now apply to MB as a result of its exercise of its right of first refusal as well as to any proposed assignee of MB." MB agreed to continue to be bound by the terms and conditions of the APA as if it were the original party.

Asbury did in fact terminate the APA with Fresno that same day, June 19, 2009. Fresno challenged MB's exercise of its ROFR as untimely. After MB's attempts to assign the APA to a third party failed, MB agreed to mediate its dispute with Fresno. That mediation took place on July 30, 2009, at which time MB agreed to assign its rights under the APA

back to Fresno under certain conditions.  Neither Asbury nor MB had yet informed Fresno of the Acknowledgment Agreement.  Fresno did not receive that information until August 31, 2009.

MB's counsel memorialized the conditions of the assignment in an email to Fresno's counsel immediately after the mediation. MB and Fresno negotiated and finalized the terms of an "Assignment and Assumption Agreement" by August 28, 2009.  Fresno did not sign, however, and negotiations reached an impasse when MB would not provide the Landlord with a guaranty of Fresno's obligations under the Sublease.  Still unaware of the Acknowledgment Agreement, Fresno attempted to negotiate with the Landlord an assumption of Asbury's lease or a new lease with an option to purchase.  These negotiations were ultimately unsuccessful, and in mid-October Asbury terminated the APA.

## II.

We review de novo a district court's order granting summary judgment.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  We may affirm "on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) (citation omitted).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence in the light most favorable to the non-moving party to determine if there are

any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). The court draws all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is "material" only if it might affect the outcome of the case, and a dispute is "genuine" only if a reasonable trier of fact could resolve the issue in the non-movant's favor. *Id*. at 248. Summary judgment is improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).

## III.

A. *Tortious Interference*

Plaintiffs assert that by exercising its ROFR in an "untimely" and therefore "unlawful" manner, MB tortiously interfered with plaintiffs' contractual relationship with Asbury and their prospective economic advantage in the Fresno Dealership. Under California law, the elements of the tort of intentional interference with contractual relations are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1, 3–4, 791 P.2d 587, 589–90 (1990). Tortious interference with prospective economic advantage is similar, protecting "the same interests and stable economic relationships as does the tort of interference with contract,"

with the chief practical distinction being that "a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective." *Id*. In addition, a claim for interference with prospective economic advantage requires proof that the defendant "not only interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, USA, Inc.*, 11 Cal. 4th 376, 393, 45 Cal. Rptr. 2d 436, 447, 902 P.2d 740, 751 (1995).

The district court granted summary judgment to MB, concluding that because MB "had a substantial, continuing economic interest and necessary involvement in the APA that was contractually recognized and statutorily protected," it was "not - a - stranger" to the relationship between plaintiffs and Asbury. Under the district court's interpretation of California law, the two interference torts "may only lie against 'strangers' or interlopers who do not have a direct and significant interest in the plaintiff's contractual relationship with another individual or entity." *Fresno Motors LLC v. Mercedes-Benz USA, LLC*, 852 F. Supp. 2d 1280, 1293 (C.D. Cal. 2012).

The "not - a - stranger" principle relied on by the district court is an elusive concept that has spawned much controversy in both the California courts and this court. It stems from the statement by the California Supreme Court in *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514, 28 Cal. Reptr. 2d 475, 480, 869 P.2d 454, 459 (1994), that "[t]he tort duty not to interfere with the contract falls only on strangers – interlopers who have no legitimate interest in the scope or course of the contract's performance." The issue in *Applied Equip.* was narrower, however, than the

Supreme Court's statement. The only issue was whether "a contracting party [may] be held liable in tort for conspiracy to interfere with its own contract." *Id*. at 507. Relying on the long-standing proposition that the tort cause of action for interference with contract does not lie against a party to the contract because "[o]ne contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms," the court then concluded that because a contracting party cannot be liable for the underlying tort of interference with contract, it also could not be liable for conspiracy to interfere with the contract. "Because a party to a contract owes no tort duty to refrain from interference with its performance, he or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." *Id*. at 514.

It was in this context that the *Applied Equip.* court defined the tort duty not to interfere with contract as falling "only on strangers - interlopers who have no legitimate interest in the scope or course of the contract's performance." *Id*. This statement has, not surprisingly, led many courts to hold that there is also no tort duty not to interfere falling on non-contracting parties who do have a legitimate interest in the scope or course of the contract's performance, concluding, as did the district court in the instant case, that such third-parties are not strangers to the relationship. *See, e.g. Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1688, 60 Cal. Rptr. 195, 205 (1997) (gasoline franchisor "has a clear financial interest in its dealers and therefore is privileged to 'interfere' with the contract"); *Kasparian v. Cnty. of Los Angeles*, 38 Cal. App. 4th 242, 262, 45 Cal. Rptr. 2d 90, 100 (1995); *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1595, 1603, 92 Cal. Rptr. 3d 442, 429 (2009).

This court, too, has addressed the issue, stating that "California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests." *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001) (emphasis in original). The principle enunciated in *Marin Tug* has been followed by several district courts within this circuit. *See, e.g. ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1097 (N.D. Cal. 2006); *Nat'l Rural Telecomms. Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1070–72 (C.D. Cal. 2003).

More recently, however, several decisions of the California Courts of Appeal have rejected *Marin Tug*'s interpretation of *Applied Equip.*, concluding that *Applied Equip.* should be limited to its specific holding that only parties to a contract are excluded from asserting an intentional interference claim. *See, e.g.*, *Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344, 352–53, 28 Cal. Rptr. 3d 463, 469–70 (2005); *Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp.*, 221 Cal. App. 4th 867, 883–84, 164 Cal. Rptr. 3d 811, 825 (2013); *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 959–65, 169 Cal. Rptr. 3d 689, 700–05 (2013).

Finally, just recently a panel of this court has stated that *Marin Tug*'s enunciation of California law is inconsistent with the later decisions of the California intermediate courts in *Powerhouse* and *Woods*, concluding that only the contracting parties have a "direct interest or involvement in that relationship," thus limiting *Applied Equip*. to its specific

holding that only parties to a contract are immune from claims of intentional interference with existing contractual relations. *United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1007–08, (9th Cir. 2014) (citations omitted).[1]

As is readily apparent, the viability of the "not - a - stranger" principle relied on by the district court is in a state of flux, and there is no indication that the California Supreme Court will clarify it any time soon. This court need not reach the issue, however, because, as plaintiffs emphasized repeatedly in their district court briefs, "an auto manufacturer who lawfully exercises an unexpired ROFR cannot be sued for inducing a breach of contract," and in this court, "Fresno Motors' suit is premised on MB's unlawful and improper means of interfering with Fresno Motors' APA" by exercising its ROFR in an allegedly untimely and unlawful manner. Notably, even plaintiffs readily admit that both their intentional interference with prospective economic advantage claim and their intentional interference with contract claim fail if MB properly and timely exercised its ROFR.

The district court, in a brief footnote in an otherwise lengthy and comprehensive opinion, stated that "the parties dispute the timing of [MB's] exercise, and the Court finds that this issue implicates contested facts that cannot be resolved on a motion for summary judgment . . . ." *Fresno Motors*, 852 F. Supp. 2d at 1302–03 n. 16. The district court, however, did not identify what facts it viewed as contested, and our review of the record and the parties' briefs reveals no such contest. The date, time, and manner by which MB

---

[1] *United Nat'l Maint.* involved intentional interference with contract only, and its holding is limited to that tort. 766 F.3d at 1007.

exercised the ROFR are all incontestably established by the documents in the record, and clearly demonstrate that MB timely and lawfully exercised its ROFR, leaving plaintiffs with no claim for intentional interference with contract or prospective economic advantage.

The ROFR is contained in Section IX. B. of the Dealer Agreement between MB and Asbury, which provides:

> 1.  Rights Granted.
>
> If a proposal to sell Dealer's principal assets or transfer the majority ownership in Dealer is submitted by Dealer to [MB], . . . [MB] has a right of first refusal or option to purchase such assets or ownership interest, including any leasehold interest or realty. [MB's] exercise of its right or option under this Section IX. B supercedes Dealer's right to transfer its interest in, or ownership of, the Dealership. [MB's] right or option may be assigned by it to any third party and [MB] hereby guarantees the full payment to Dealer of the purchase price by such assignee.

Under Section IX. B. 2., MB had sixty days from its receipt of all data and documentation customarily required by it to evaluate a proposed transfer of ownership within which to exercise its ROFR. The Agreement does not specify any manner by which MB is required to communicate its exercise of its ROFR. Other sections of the contract do specify when notice and/or written notice are required. For example, notice is required under: Section I. A. when MB revises vehicle prices; Section III. E., where the Dealer agrees to provide

prompt notice to MB of any customer complaints; and Section VIII. C., where the Dealer is required to provide written notice of any dispute over deductions or offsets imposed by MB within ninety days. Other provisions actually indicate that notice shall be in writing and "shall be mailed to the person(s) designated to receive such notice, via overnight mail, or shall be delivered in person." Section XI. F. Finally, the Dealer Agreement contains a general notice provision (XIV) that provides, "[e]xcept as otherwise specifically provided herein, any notice required to be given by either party to the other shall be in writing, shall be delivered personally or by mail to the party at its address as stated in this Agreement, and shall be effective upon receipt by hand delivery or upon mailing."

MB's contractual ROFR is tempered by the California Vehicle Code. In particular, Cal. Veh. Code § 11713.3(t)(2) provides that it shall be unlawful for a manufacturer to exercise a right of first refusal unless "[t]he franchisor gives written notice of its exercise of the right of first refusal no later than 45 days after the franchisor receives all of the information required pursuant to subparagraph (A) of paragraph (2) subdivision (d)." That information must include all information generally utilized by the manufacturer in reviewing a prospective franchisee.

In the instant case, it is undisputed that MB did not receive the final necessary document, the Wholesale Financing Commitment Form signed by Mercedes-Benz Financial evidencing its commitment to extend floor plan financing to the actual purchaser, Fresno Motors, a requirement under the standard dealer agreement, until May 1, 2009. Indeed, Fresno did not become the actual purchaser until it, Selma, and Asbury executed the second amendment

to the APA on May 1, 2009. That was the last piece of required information as far as MB was concerned, and that was the trigger date for exercising its ROFR. Any argument to the contrary is simply specious. MB was entitled to the documents establishing Fresno as the purchaser and was entitled to a commitment of Floor Plan Financing by Mercedes-Benz Financial to the actual purchaser.

That means that MB had until June 15, 2009, to exercise its ROFR. It is undisputed that it did so by sending a letter to Asbury by both email and facsimile at 5:18 p.m. PDT. It also sent a copy of that letter to Fresno via email and facsimile on that date. Finally, the following day, June 16, it placed the letter with Federal Express for overnight delivery. Plaintiffs argue that MB's exercise was untimely because it came after 5:00 p.m., and improper because it was transmitted electronically rather than by regular mail. This argument fails for a variety of reasons. First, under the Dealer Agreement, the only party entitled to any form of communication from MB of its exercise of the ROFR was Asbury, which has never complained about the timing or manner of MB's exercise of the ROFR. The Dealer Agreement is silent as to the manner by which MB was to exercise this right. Certainly, nothing in the provisions granting MB the ROFR requires MB to give formal notice pursuant to the agreement's notice provision or otherwise. Consequently, the "notices" provision of the Dealer Agreement in section XIV. A., which governs when notice is "required to be given by either party," does not apply.

Plaintiffs argue that regardless of the Dealer Agreement, section 11713.3(t)(2) of the California Vehicle Code requires the franchisor to give forty-five days written notice to lawfully exercise a ROFR. This section does not provide a

ROFR, however; it simply allows a franchisor to exercise a contractual right pursuant to the terms of the contract, and is silent as to whom notice should be given. Nothing in the statute suggests that notice must be sent to the prospective transferee.[2]

Plaintiffs also argue that their right to notice under the statute can be implied because subsection (t)(6) requires the franchisor to reimburse the proposed transferee for its expenses incurred in evaluating the proposed transfer. But that section has its own notice provision, requiring the proposed transferee to provide the franchisor a written itemization of such expenses within thirty days of receipt of a written request from the franchisor. Cal. Veh. Code § 11713.3(t)(6). Nothing in this section implies that the proposed transferee is entitled to notice of the franchisor's exercise of a ROFR. Quite the opposite. It demonstrates that the legislature specifically provided for notice to the proposed transferee when it wanted it to be given. The fact that the legislature did not specifically require notice from the franchisor to the proposed transferee of the exercise of a ROFR suggests that it did not see the need for such notice.

Finally, even if plaintiffs were entitled to notice from MB of its exercise of the ROFR, the notice plaintiffs received was both timely and in proper form. Nothing in either the Dealer Agreement or section 11713.3(t)(2) requires that notice be received (or sent) by 5:00 p.m. or the close of business. A statement (relied on by plaintiffs) by MB's Dealer Network Manager that he considered 5:00 p.m. on June 15, 2009, to be

---

[2] When the statute requires any form of communication from the franchisor to the proposed transferee it is specifically spelled out. *See* Cal. Veh. Code § 11713.3(t)(6).

their deadline is certainly not legally binding on MB, particularly when plaintiffs have not claimed that they relied to their detriment on that statement. There is no evidence in the record to even remotely suggest that plaintiffs took any detrimental action between 5:00 p.m. and 5:18 p.m. Thus, even if plaintiffs were entitled to receive notice of MB's exercise of the ROFR, their receipt of that notice on June 15, 2009, was timely.

The form of notice was also proper. Section 11713.3(t)(2) requires "written notice." It does not require any particular form of notice or define the manner by which such written notice must be delivered. When the legislature intended to require written notice be delivered in a specific manner, it specifically did so. For example, section 11713.3(d) expressly states that the notice of the manufacturer's approval or disapproval of a proposed sale must "be in writing and shall be personally served or sent by certified mail, return receipt requested, or by guaranteed overnight delivery service that provides verification of delivery and shall be directed to the franchisee." Cal. Veh. Code § 11713.3(d)(2). The legislature provided no such specification of the notice required to lawfully exercise a ROFR. All that is required is some form of written notice.

Citing Cal. Civ. Code § 1633.5, plaintiffs argue that electronic notice is insufficient unless agreed upon by the parties. That section is part of the California Uniform Electronic Transactions Act, and specifically indicates that it applies only to a transaction between parties who have agreed to conduct the transaction by electronic means. Cal. Civ. Code § 1633.5(b). Plaintiffs and MB had not engaged in any transaction, electronic or otherwise, when MB exercised its ROFR. Plaintiffs' right to written notice, if they had any at

all, comes from the California Vehicle Code. Section 1633.7 of the Electronic Transfer Act provides that if a law requires a record to be in writing, or requires a signature, an electronic record or signature suffices. Cal. Civ. Code § 1633.7(c)–(d). Thus, plaintiffs' receipt of the notice by electronic mail and facsimile constitutes written notice.[3]

Because MB lawfully exercised its ROFR, plaintiffs have no claim for intentional interference with prospective economic advantage, which requires plaintiffs to demonstrate that MB committed a legal wrong independent from the interference. *Della Penna*, 11 Cal. 4th at 393. Nor can MB's conduct be considered "wrongful." Even if MB misled plaintiffs by setting a self-imposed deadline to exercise and then missing it by a few minutes, plaintiffs cannot show that they were entitled to notice of MB's exercise of its ROFR or that they were harmed by the insignificant delay. Thus, plaintiffs also have no claim for intentional interference with contract. As plaintiffs themselves candidly admit, "an auto manufacturer who *lawfully* exercises an *unexpired* ROFR is not liable for interference." Consequently, summary judgment to MB on these claims is affirmed.

B. *Fraudulent Concealment*

Plaintiffs' claim for fraudulent concealment "arises from the Acknowledgment Agreement and whether MB promised

---

[3] The court notes that during the entire course of events, most, if not all communications, including submission of documents between plaintiffs, Asbury, and MB were sent electronically. "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Cal Civ. Code § 1633.5(b).

it would guarantee a sublease of the Dealership premises in the event that MB assigned its right to purchase [the Fresno Dealership] to a third party." According to plaintiffs, they incurred unnecessary expenses attempting to get Asbury released from the Lease, either by assuming the Lease and the two ten year renewals or by entering a new lease with the Landlord. These negotiations stalled because the Landlord would not accept any lease without Asbury's or MB's guaranty. Plaintiffs claim that had they known that MB had already guaranteed their performance under a sublease, they would not have needed to enter those negotiations. The district court granted summary judgment to MB, concluding that plaintiffs misinterpreted the Acknowledgment Agreement as a guaranty and because the purportedly concealed facts of that agreement were not material and had been disclosed already to plaintiffs or were readily discoverable. We agree and affirm.

According to the FAC, after the conclusion of the mediation, MB's counsel sent an email to plaintiffs' then counsel setting forth the general terms of their agreement to assign MB's rights under the APA back to Fresno. Plaintiffs' counsel replied by indicating that one issue was assuring that plaintiffs would acquire the balance of the Lease plus the two ten-year extensions, so that plaintiffs would have sufficient time to make certain improvements that MB required. Plaintiffs' counsel indicated that he thought MB would execute its ROFR and obtain a lease assignment from the Landlord, and that plaintiffs would then get an assignment or sublease from MB. This was necessary because the Landlord was not comfortable with an assignment to a small dealer but would be comfortable with MB on the lease.

MB's counsel responded by informing plaintiffs' counsel that MB would not enter into a sublease of the premises with the Landlord and would not guarantee Fresno's performance of a sublease of the premises. According to plaintiffs, MB intentionally withheld the fact that in the Acknowledgment Agreement it had already agreed to be primarily responsible for any sublease of the premises, leaving plaintiffs to negotiate with the Landlord on the terms of an assumption by Fresno of Asbury's lease or a new lease with an option to purchase. MB did this, according to plaintiffs, because the Landlord would not agree to any form of lease without a guaranty from MB or Asbury and, knowing that Asbury would not agree to remain obligated to the Landlord without a guaranty from MB, MB wanted to force plaintiffs to negotiate terms that would release Asbury from the lease.

Under California law, the elements of a claim for fraudulent concealment are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) the plaintiff was damaged by the concealment. *Jones v. ConocoPhillips*, 198 Cal. App. 4th 1187, 1198, 130 Cal. Rptr. 3d 571, 579 (2011).

The operative provision of the Acknowledgment Agreement provides:

> 1. *Terms of Exercise* . . . . MB will be subject
> to the same terms and conditions under the
> Fresno Motors APA as such terms and

conditions apply to Fresno Motors. Further, any subsequent assignment by MB of its rights or obligations under any or all of the Fresno Motors APA and the Purchase Documents, including, without limitation, the Sublease shall not operate as a release of MB of its obligations under such Agreements. For avoidance of doubt, MB expressly agrees that it shall be primarily responsible for the performance under the Fresno Motors APA and the Sublease. Asbury acknowledges that MB may assign its rights and obligations under the Fresno Motors APA and the Sublease to a third party provided that MB remain primarily responsible for the performance of any such assignee with respect to the Fresno Motors APA and the Sublease.

Construing this provision under the California Rules of Contract Construction as set out in *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1992), and the California Civil Code, the district court properly concluded that the Acknowledgment Agreement means only that "if [MB] assigns its rights under the APA, it would still remain 'primarily responsible' under the APA and sublease as if it were the original buyer, such that the assignment 'shall not operate as a release of MB of its obligations.'" *Fresno Motors*, 852 F. Supp. 2d at 1311. As the court noted, the same message was underscored throughout the Acknowledgment Agreement: "that in exercising its right of first refusal, [MB] will take Fresno Motor[s'] place as the buyer and assume all of Fresno Motor[s'] rights and obligations, including those under the sublease, and that by assigning its right, it will continue to

remain obligated to Asbury for the assignee's performance of the sublease." *Id*. at 1312. Finally, the court concluded that the term "primarily responsible" was not reasonably susceptible to mean a guaranty to the Landlord of plaintiffs' obligations under a sublease. *Id*.

On appeal, plaintiffs do not challenge the district court's construction of the Acknowledgment Agreement, only its conclusion that MB had not concealed from plaintiffs any material fact because that agreement could not be interpreted to mean that MB guaranteed to the Landlord plaintiffs' performance under the Sublease. They contend that the fact that MB "guaranteed" to Asbury plaintiffs' performance under the Sublease was material, and that had they known of this guaranty they would not have entered negotiations with the Landlord.

This argument is belied by the facts. Plaintiffs admit that the Landlord wanted either that Asbury remain on the Lease or that MB issue a guaranty to it. Asbury wanted to be free from any obligation to the Landlord. That is what forced plaintiffs to negotiate either an assumption of the master Lease (releasing Asbury) or a guaranty running from MB to the Landlord, something to which MB had not and would not agree.

The fact that MB had "guaranteed" plaintiffs' payments to Asbury is irrelevant to plaintiffs' claim on appeal. Such a guaranty did not relieve Asbury from its obligations to the Landlord. At most, it meant that if plaintiffs had failed to pay on the lease, Asbury would have to pay the Landlord and then seek reimbursement from MB. That is not what Asbury wanted; it wanted out. Consequently, plaintiffs' claim that MB and/or Asbury fraudulently concealed the existence of

the Acknowledgment Agreement has no merit. We therefore affirm summary judgment on this claim.

C. *California Vehicle Code § 11713.3(t)(6)*

In Count IV of the FAC, plaintiffs seek reimbursement for expenses incurred in negotiating the APA that was usurped when MB exercised its ROFR. The count is brought under Cal. Veh. Code § 11713.3(t)(6), which provides in relevant part that:

> It is unlawful and a violation of this code for a manufacturer . . . to do . . . any of the following:
>
>> (t) [t]o exercise a right of first refusal or other right requiring a franchisee . . . to sell, transfer, or assign to the franchisor, all or a material part . . . of the franchised business unless . . .
>>
>> (6) [t]he franchisor shall reimburse the proposed transferee for expenses paid or incurred by the proposed transferee in evaluating . . . and negotiating the proposed transfer . . . . The proposed transferee shall provide the franchisor a written itemization of those expenses . . . within 30 days of the proposed transferee's receipt of a written request from the franchisor for that accounting. The franchisor shall make payment within 30 days of executing the right of first refusal.

MB argues, and the district court held, that plaintiffs have no standing to pursue this claim because the statute provides no private right of action to proposed transferees. We disagree.

Not every violation of a state statute gives rise to a private cause of action. Whether a party has a right to sue depends on "whether the Legislature has 'manifested an intent to create such a private cause of action' under the statute." *Lu v. Hawaiian Gardens Casino, Inc.*, 50 Cal. 4th 592, 596, 236 P.3d 346, 348, 113 Cal. Rptr. 3d 498, 501 (2010) (*quoting Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal. 3d 287, 305, 250 Cal. Rptr. 116, 126, 758 P. 2d 58, 69 (1988)). The legislature's intent is revealed through the language of the statute and its legislative history. *Id*. Some statutes contain "'clear, understandable, unmistakable terms' which strongly and directly indicate" an intent to create a private cause of action, such as when the statute expressly states "that a person has or is liable for a cause of action for a particular violation." *Id*. at 597 (*quoting Moradi-Shalal*, 46 Cal. 3d at 295). More commonly, a statue may refer to a remedy or means of enforcing its substantive provisions. When a statute does not contain such obvious language, the legislative history must be examined. *Id*.

Section 11713.3(t)(6) does not specifically state that a prospective transferee has a cause of action to recover unpaid expenses, nor does it specifically refer to a remedy or means of enforcement. It does, however, indicate the legislature's intent that a proposed transferee have a right to recover its expenses from a franchisor that usurps its contract by exercising a ROFR. The creation of this right to recovery, which did not previously exist, distinguishes this section from those, as in *Lu*, that merely codify existing rights. In *Lu*, for

example, a casino's mandatory tip pooling policy required dealers to contribute a percentage of their tips to a pool to be shared with other casino employees. 50 Cal. 4th at 595. The dealers sued, alleging a violation of California Labor Code § 351, which provided that "[n]o employer . . . shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron . . . . Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for." *Id*. at 597–98.

The California Supreme Court, after reviewing the statute, the entire statutory scheme, and the legislative history, held that the section did not create a private cause of action, concluding that it simply afforded what courts had long held: "that gratuities ordinarily belonged to the waiter or waitress absent a contrary agreement . . . [and] did not reflect a legislative intent to give employees a new statutory remedy to recover any misappropriated gratuities." *Id*. at 601.

Unlike the statute in *Lu*, the California Vehicle Code, and in particular subsection (t)(6), did create new rights and remedies for displaced prospective buyers. Prior to enactment, such buyers had no right to recoup their expenses from the proposed seller unless they had contractually arranged to do so.

To this end, MB argues that the California Vehicle Code creates new rights and obligations between manufacturers and dealers only, but not for proposed transferees. It suggests that subsection (t)(6) is designed to protect the franchisee from suit by the proposed buyer for the unnecessary expenses. For example, the instant Dealership Agreement provides that if, as a result of MB's exercise of its ROFR, the dealer (Asbury)

is contractually obligated to reimburse the initial buyer for expenses incurred in connection with the Buy/Sell Agreement, MB shall reimburse the dealer for such costs in an amount "up to but not exceeding Fifty Thousand Dollars ($50,000.00)." Under MB's theory, subdivision (t)(6) would trump the contract and allow payment to the initial buyer of all its fees.

This argument is belied by the plain language of the statute, which requires the manufacturer to pay all of the proposed buyer's reasonable expenses directly to that party. Had the legislature wanted to protect only the dealer as MB has suggested, it would have simply required the manufacturer to reimburse the dealer for all expenses it was contractually obligated to pay to the initial buyer. It did not do so. Instead it gave the initial buyer a statutory right to recover its reasonably incurred expenses from the manufacturer, even in the absence of a contractual right.

MB also argues that the only private cause of action created by the Vehicle Code is contained in section 11726, which provides that any licensee suffering pecuniary loss because of a willful failure by another licensee to comply with any provisions of the Code may recover damages and attorney's fees in court. MB argues that because the cause of action in section 11726 is limited to licensees, the legislature intended no private cause of action for proposed transferees. Section 11726 is a remedial section, however, not a standing section, and it "merely specifies the remedy available for violations of subsection (e) and does not expand or restrict the scope of those entitled to sue under it." *Larry Menke, Inc. v. DaimlerChrysler Motors Co.*, 171 Cal. App. 4th 1088, 1094, 90 Cal. Rptr. 3d 389, 394 (2009).

*Menke* demonstrates the error in MB's position.    In *Menke*, an automobile dealer and its proposed transferee sued the manufacturer for violations of § 11713.3(e) after the manufacturer refused to approve the dealer's application to transfer its dealership.  Subsection (e) makes it unlawful and a violation of the Vehicle Code for any manufacturer "[t]o prevent, or attempt to prevent, a dealer from receiving fair and reasonable compensation for the value of the franchised business," and further provides that "[t]here shall not be a transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld or conditioned upon the release . . . of a claim or defense by the dealer."  Cal. Veh. Code § 11713.3(e).    Concluding that the prospective transferee lacked standing under subsection (e), *Menke* held that the terms of the section could not be clearer: "it protects franchise owners against manufacturer conduct that would prevent the dealer from receiving fair and reasonable compensation for the value of the franchised business.  The statute says nothing about potential purchasers."  *Menke*, 171 Cal. App. 4th at 1093.  Notably, despite the lack of any specific language strongly creating a right of action, the court did not conclude that there was no right of action under the statute, simply that a prospective transferee or purchaser had no right to sue the manufacturer for failure to approve the sale.  Indeed, it specifically affirmed and quoted the trial court's holding that "[t]he plain language of the code section makes clear that it is the dealer selling the franchise who has *standing to sue*, and not a prospective buyer."  *Id*. (emphasis added).

In contrast to subsection (e), the plain language of subsection (t)(6) speaks entirely to the right of the proposed transferee, and says nothing about current franchisees.  Thus,

following the reasoning in *Menke*, the plain language makes clear that it is the proposed transferee that has standing to sue, and not the current franchisee. Any other construction renders the subsection meaningless. It would grant a proposed transferee the right to receive payment for its expenses without the ability to enforce that right in any meaningful manner. Because we conclude that plaintiffs have an implied right of action under section 11713.3(t)(6), we reverse the summary judgment to MB on Count IV, and remand for proceedings consistent with this conclusion.

D. *Unfair Competition (UCL)*

Finally, we affirm the district court's grant of summary judgment to MB on plaintiffs' claim under the California Unfair Competition Statute, which prohibits an entity from engaging in "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Section 17200 "borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under Bus. & Prof. Code §17200 *et seq*. and subject to the distinct remedies provided thereunder." *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383, 6 Cal. Rptr. 487, 491, 826 P.2d 730, 734 (1992) (internal quotation marks omitted).

In the FAC plaintiffs based their UCL claims on the alleged claims for tortious interference, providing unlawful notice under section 11713.3(t)(2), and fraudulent concealment. Because the court has affirmed summary judgment to MB on all those claims, MB is entitled to summary judgment on the UCL claims as well.

Additionally, the remedy for a UCL violation is either injunctive relief or restitution. *See* Cal. Bus. & Prof. Code § 17203. The restitutionary relief is limited to money or property lost by the plaintiff and acquired by the defendant. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 335–36, 120 Cal. Rptr. 3d 741, 761–62, 246 P.3d 877, 894 (2001). "Restitution under § 17203 is confined to restoration of any interest in money or property, real or personal, which may have been *acquired* by means of such unfair competition." *Id*. (emphasis in original) (internal quotation marks omitted). As *Kwikset* noted, the economic injury caused by an unfair business practice may often involve a loss by the plaintiff without any corresponding gain by the defendant. Such is the instant case, at least as to plaintiffs' remaining claim under section 11713.3(t)(6). Under these circumstances, injunctive relief is the only available remedy. *Kwikset*, 51 Cal. 4th at 336.

Because plaintiffs do not seek injunctive relief and have no claim for restitution under section 17203, MB is entitled to summary judgment on the UCL claims.

**AFFIRMED IN PART, REVERSED IN PART** and **REMANDED** for proceedings consistent with this opinion. Each party shall bear its own costs on appeal.