**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-16-1104-KiFD |
| ROBERT LEONARD KAPLAN, | Bk. No. 2:11-bk-60249-RK |
| Debtor. | Adv. No. 2:12-ap-01415-RK |
| ROBERT LEONARD KAPLAN, | |
| Appellant, | |
| v. | **AMENDED MEMORANDUM**[1] |
| RENEWABLE RESOURCES COALITION, INC.; ARTHUR HACKNEY; HACKNEY & HACKNEY, Inc., | |
| Appellees. | |

Argued and Submitted on November 17, 2016,
at Pasadena, California

Filed - December 9, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Robert N. Kwan, Bankruptcy Judge, Presiding

Appearances:     Leslie A. Cohen argued for appellant Robert Leonard Kaplan; Stephen W. Cusick of Nielsen, Haley & Abbott LLP argued for appellees Renewable Resources Coalition, Inc., Arthur Hackney and Hackney & Hackney, Inc.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, it has no precedential value. See 9th Cir. BAP Rule 8024-1.

-1-

Before:  KIRSCHER, FARIS and DUNN,[2] Bankruptcy Judges.

Appellant Robert Leonard Kaplan ("Debtor") appeals a judgment determining that the debt of appellees was nondischargeable under § 523(a)(4) and (a)(6).[3]  The bankruptcy court applied issue preclusion to a prepetition arbitration award obtained by appellees and found that it and certain undisputed facts in the record established the elements of both claims.  Thus, the court granted appellees summary judgment.  Debtor also appeals the order denying his cross-motion for summary judgment and the order denying his motion to dismiss appellees' second amended complaint.  We AFFIRM the judgment entered pursuant to § 523(a)(6).[4]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Prepetition events**

**1.    Events leading up to the arbitration**

The instant dispute arises out of an arbitration award in which Debtor's corporation was found to have misappropriated Appellees' confidential client documents by selling them to their

---

[2]  Hon. Randall L. Dunn, Bankruptcy Judge for the District of Oregon, sitting by designation.

[3]  Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[4]  Debtor, not through counsel, filed a letter, dated December 1, 2016, in this appeal, which is identified as Document 24.  Debtor requests that the Panel consider his letter as a Request for Judicial Notice, although it appears to provide facts and argument.  At oral argument, the Panel did not request Debtor to file any post-argument submission or any other document.  The Panel declines to consider Debtor's Document 24, given that the appeal was deemed submitted for decision on November 17, 2016, and Debtor, through counsel, had the opportunity to present his argument through written and oral presentations based on the submitted record.

-2-

opponents. Debtor is a professional fund-raiser in California for political campaigns. Fund Raising, Inc. ("FRI") is a California corporation through which Debtor conducted his fund-raising business. Debtor is the president, sole shareholder and sole employee of FRI. Appellee Renewable Resources Coalition, Inc. ("RRC") is a non-profit corporation based in Alaska. It conducts education, research, publicity and fund-raising efforts in opposition to the proposed development of Pebble Mine – a large, open pit mine in Alaska. Appellee Arthur Hackney is a political consultant who helped manage the campaign in opposition to Pebble Mine. Appellee Hackney & Hackney, Inc. is a corporation through which Hackney conducts his political consulting business ("Hackney," together with RRC, "Appellees").

In April 2008, FRI executed a Consulting Agreement with RRC, Hackney and others to provide fund-raising services for RRC's anti-Pebble campaign, which included a high-profile campaign in support of an Alaskan ballot initiative known as the Clean Water Initiative. The Consulting Agreement did not name Debtor as a party, but he did sign it for and on behalf of FRI. Debtor/FRI was copied with the campaign's internal correspondence so that his pitch for donations would accurately track the arguments being asserted elsewhere in the campaign. Because FRI was paid a commission on amounts donated, Debtor/FRI was also provided copies of RRC's bank deposit records, showing donations to RRC and the name of the person or entity making the donation. RRC also provided Debtor/FRI with RRC's donor and membership lists for purposes of solicitation. RRC considered its donation and membership information to be highly confidential and expressed

-3-

this to staff and board members.

Under the Consulting Agreement, FRI agreed that it would, "with respect to any information designated by Client or its member organizations as confidential, hold such information in confidence and use same only in connection with the services provided hereunder." Debtor testified that he was a member of the Board of Directors of the American Association of Political Consultants, and considered himself bound by its Code of Ethics, which provides, in part:

> I will respect the confidence of my clients and not reveal confidential or privileged information obtained during our professional relationship.

Ultimately, the Clean Water Initiative failed in the August 2008 election, thereby paving the way for the Pebble Mine project to continue.

Unhappy with FRI's fund-raising efforts, board member Richard Jameson, on behalf of RRC and the other parties to the Consulting Agreement, emailed Debtor/FRI in September 2008 to advise that they were electing to terminate the Consulting Agreement effective October 4, 2008. In response, Debtor on behalf of FRI sent two emails on October 1 and 30, 2008. In the October 1 email, Debtor asserted that amounts remained due under the contract and stated that the parties needed "a simple resolution" of his claim given "all the focus on Alaska by the national media and all those reporters running around looking for almost anything interesting to write about" and "APOC's[5] review of the campaign's finances . . . ." In the October 30 email, Debtor quoted a number of

---

[5] APOC, the Alaskan Public Officials Commission, is a state regulatory body that oversees campaign finance issues in Alaska.

internal campaign communications and suggested that RRC was set up illegally to "veil contributors" or as a "pass through" for contributions from Bob Gillam (a significant contributor to the campaign effort). Debtor further referred to "anonymous discussions with APOC" that suggested that RRC's position was "problematic."

## 2. The arbitration and APOC proceeding

### a. FRI files the demand for arbitration.

In October 2008, FRI initiated an arbitration proceeding as provided in the Consulting Agreement. FRI asserted several claims against RRC, Jameson and others. Retired Judge G. Keith Wisot presided over the matter.

While the arbitration action was pending, in early January 2009, California attorney Allan Kaplan, Debtor's brother, acting as counsel for Debtor and FRI, contacted Alaska attorney Thomas Amodio, who had represented Pebble Mine interests during the campaign. Amodio confirmed that the topic of the initial contact concerned reaching some agreement by which Amodio's Pebble clients might acquire documentation with which to pursue an APOC complaint for violations of campaign finance laws against opponents Gillam, RRC and Americans For Job Security.[6]

Debtor on behalf of FRI met with Amodio in California on February 2, 2009, to show Amodio documents FRI had obtained in its work for the non-profits opposing the Pebble Mine. Amodio did not

---

[6] Amodio had filed a prior APOC complaint against these anti-Pebble Mine parties, but the complaint was dismissed due to lack of evidence. However, Amodio believed the internal documents Debtor/FRI acquired while working as a fund-raiser for RRC would vindicate that complaint.

-5-

recall any discussion of the merits of the arbitration; to Amodio, the whole point of the meeting was to raise Amodio's clients' interest in the documents held by Debtor/FRI. At that meeting, Debtor on behalf of FRI asked Amodio whether he could provide FRI with either legal representation in the California arbitration proceeding or financial support for the arbitration.[7]

At some point in February 2009, before a second meeting with Debtor on March 1, 2009, both Amodio and Matthew Singer — a second Alaska attorney whose firm also represented Pebble Mine interests – told Debtor they would not represent FRI in the California arbitration. In an email to Debtor dated February 23, 2009, Amodio confirmed that no ongoing attorney-client relationship existed between him and Debtor or FRI, but Amodio did confirm that the documents Debtor showed him on February 2 remained confidential and protected by the attorney-client privilege, because FRI had approached him for purposes of seeking legal advice.

In February 2009 phone discussions with Singer, Debtor on behalf of FRI asked for $450,000 for the documents; Singer offered

---

[7] A February 23, 2009 email from Debtor/FRI to Amodio appears to reveal that Debtor/FRI also sought Amodio's assistance for filing their own APOC complaint against FRI's former clients. This email contained a draft letter authored by Debtor to a John Shively, a Pebble entity officer, regarding the RRC documents FRI had in its possession. In what seems to be Debtor's seeking of approval from Amodio for the content of the letter, Debtor's proposed pitch to Shively was:

You can evaluate the millions of dollars in campaign and other costs to be saved in the next few years if you are able to call attention to the actions of your opponents through an APOC complaint. You know these same opponents caused you and your colleagues to spend many millions of campaign and public education dollars to protect your interests.

-6-

$34,000; they agreed to $50,000.

On March 1, 2009, Debtor on behalf of FRI met with Alaska attorneys Amodio and Singer in California. Debtor had organized the documents with tabs identifying what he thought were various violations of Alaska campaign laws. During the meeting, Amodio, at Singer's request, removed from the set of documents any that were marked as "confidential." The $50,000 check Singer gave to Debtor was documented in an engagement letter with Singer's firm as a fee for FRI to be a consulting expert in the case Singer would file with APOC. Debtor signed the engagement letter; Singer took with him the documents not marked confidential, including donor lists, bank account information and contact lists obtained from RRC.

### b.   The APOC Complaint is filed.

In March 2009, Singer filed a complaint before APOC on behalf of the Pebble parties against RRC, Gillam and others. The gist of the charge was that the non-profits, including RRC, had been set up or used to shield from public view the fact that substantial contributions in support of the Clean Water Initiative were being made by Gillam, whose home is near Pebble Mine. The APOC Complaint stated in a footnote that "the exhibits [attached to the complaint] marked as 'Doc #000001—000132' were provided by Robert Kaplan, who has served as a consultant in this matter."

Jameson recognized the 132 exhibits to the APOC Complaint as RRC documents provided to Debtor on behalf of FRI during FRI's retention, which included multiple internal campaign planning communications. The exhibits also included bank deposit detail from RRC for April through July 2008, which were unredacted and

showed the names of all contributors, be they members or donors to RRC, during that time and the amounts of contributions.

Ultimately, the APOC matter was settled, as memorialized in a Consent Decree filed in February 2010. All charges against Hackney were dismissed for lack of a legal and factual basis. The remaining respondents agreed to pay $100,000 to the State of Alaska, which was half of the investigation cost. The Consent Decree recited that it "shall not constitute a formal finding on the merits of the complaints or of any other violation of any statute," and that "nothing [in it] constitutes any acknowledgment of any wrongdoing by any party."

### c. Counterclaims filed in the arbitration

As a result of Debtor/FRI's sale of FRI's former clients' documents to its political opponents, RRC brought four counterclaims in the arbitration against both Debtor and FRI, alleging professional negligence, breach of contract, interference with prospective economic advantage, and unjust enrichment. Hackney brought similar counterclaims. RRC and Hackney alleged they suffered damages as a result of Debtor and FRI's actions, including loss of income, loss of grants, loss of public support and great public embarrassment. Although RRC and Hackney named Debtor individually as a counter-respondent, the arbitrator ruled that as a nonparty to the Consulting Agreement, which governed the arbitration, Debtor could not be made a party to the arbitration, and respondents had not sufficiently alleged any alter-ego theory to order a nonparty to participate in arbitration.

-8-

### d.  Discovery, briefing and pretrial orders in the arbitration

During his deposition, Debtor testified that he had met on behalf of FRI with Alaska attorneys Amodio and Singer in late February or early March 2009, before the APOC Complaint was filed, but only to determine whether those attorneys might either represent FRI in its arbitration or help cover the cost of that litigation.  Debtor testified on behalf of FRI that Singer gave him a check made payable to FRI on Singer's law firm's account for $50,000 at the meeting for the sole purpose of helping cover FRI's costs in prosecuting the arbitration.  Debtor further testified:

•  he never conveyed any documents to Singer in exchange for the $50,000, nor did he authorize release of those documents to Singer's firm;

•  he did not know how his client's documents got into APOC's hands and wound up as exhibits to the APOC Complaint; and

•  he did not know why he was described in the APOC Complaint as a consultant, because he was never paid anything as a consultant and he never authorized anyone to so describe him.

Allan, Debtor's brother and attorney representing Debtor and FRI, gave similar testimony.

In August 2010, the arbitrator entered "Order #2," wherein he made various findings, including that no attorney-client privilege existed between Debtor and FRI and the Alaska attorneys based on the crime-fraud exception.  The arbitrator also found that in the months leading up to March 4, 2009, Debtor on behalf of FRI and Allan, in efforts to settle the fee dispute in the arbitration, repeatedly threatened the arbitration respondents with the following statements:  "that all respondents had conspired to violate Alaska election laws;" "that this information, if it

-9-

became known to [APOC], would result in great embarrassment and possible ethics investigations of the entities and individuals involved;" that Debtor and Allan "had talked with a politically-motivated attorney (Amonio) [sic] who represented mining interests and were adverse to respondents in the 2008 campaign concerning Pebble Mine;" which attorney "would love to use the damaging email correspondence from FRI's campaign to further prosecute election law violations;" that "Mr. Gillam, the primary contributor to the Pebble Mine campaign, had 'a lot of reasons' why he would not want the FRI emails to be made public;" and that the Kaplans' terms for settlement better "be accepted, or [those] dire consequences . . . would follow."  Many of the arbitrator's findings here were based on an exhibit submitted by RRC, which consisted of a March 4, 2009 email drafted by RRC attorney, Tung Khuu, reflecting his contemporaneous notes as to what happened earlier that day in a settlement negotiating meeting with Allan and Debtor/FRI.  This exhibit has been referred to as "Exhibit X" and was offered in support of Appellees' motion for summary judgment.  The arbitrator's findings made in Order #2 were later incorporated into the final award.

### e.    The final arbitration award

The arbitrator issued his Final Award ("Arbitration Award") on January 6, 2012, just after Debtor filed his bankruptcy case. In support of his decision that RRC had proven claims for (1) conversion, (2) misappropriation of trade secrets and (3) unjust enrichment, the arbitrator found that RRC's donor lists, email listings and bank information were trade secrets and were specifically discussed with Debtor as highly confidential

-10-

information by Jameson. When Debtor sold the proprietary information of his clients, he breached his fiduciary duties and the duty of loyalty inherent in his Consulting Agreement, which duties continued after the contract termination. The arbitrator rejected FRI's argument that the confidentiality clause in its Consulting Agreement provided confidentiality only to documents "marked confidential" by the client.

In addition, the arbitrator found that Debtor committed perjury in the arbitration on at least three material topics; Allan was intentionally untruthful in his testimony with respect to one topic. Specifically, the arbitrator found that Debtor on behalf of FRI and Allan were each intentionally untruthful in their hearing testimony and depositions regarding their reasons for contacting attorneys Amodio and Singer and the purpose for meeting them. Both asserted that their purpose was to seek legal representation for the arbitration. Debtor, on behalf of FRI, continued to so assert even with respect to the March 1, 2009 meeting, after the Alaskan attorneys had already made it clear in February that neither of their firms would do so.

The arbitrator found that not only should Debtor, advised by his attorney brother Allan, know that sharing documents with counsel for clients adverse to FRI's former clients was not a report to the proper authorities, but Debtor persisted to the point of committing perjury in the falsehood that he had contacted Amodio and Singer for representation in the arbitration and engaged in privileged discussions with them. Thus, found the arbitrator, the purpose of the meetings was not to consult counsel for representation in the arbitration, but rather to pursue

-11-

Debtor's threats to expose Gillam and the arbitration respondents to public and regulatory review and attempt extortion in ongoing settlement talks.

The arbitrator found that Debtor had also committed perjury in testifying he was "surprised" at being listed as a consultant for Singer and the Pebble parties in the APOC Complaint. Debtor on behalf of FRI had received, modified, returned and signed an engagement letter to act in precisely that capacity and had so acted by spending several hours reviewing the documents with Singer. The arbitrator found that this evidence supported respondents' defense of unclean hands and also established their causes of action for breach of fiduciary duty, interference with prospective economic advantage and unjust enrichment.

Damages were assessed against FRI as follows: the arbitrator awarded RRC (1) $50,000 for unjust enrichment (the amount FRI received for its misappropriation of RRC's confidential documents), (2) the $3,169 RRC spent in attorney's fees to redact documents in trying to salvage confidentiality after they were delivered to APOC, (3) $386,330 for a lost grant caused by the impact of the APOC Complaint and public investigation, as reported in the Alaska press and other public communications, and (4) $156,804 for attorney's fees and $32,704 for expenses incurred in the arbitration as a prevailing party enforcing the terms of the Consulting Agreement; Hackney was awarded (1) $1,011,681.68 for lost clients and revenues "resulting from the APOC Complaint with its FRI documents" and $56,120.30 for the attorney's fees incurred in responding to the APOC investigation (for total compensatory damages of $1,070,301.98), and (2) $675,758.76 for

-12-

attorney's fees and $69,768.77 for expenses incurred in the arbitration as a prevailing party enforcing the terms of the Consulting Agreement.

The arbitrator also awarded RRC and Hackney each $1,000,000 for punitive damages, "arising from the tort causes of action, and perjury of FRI/Kaplan." Thus, RRC was awarded a total of $1,628,977; Hackney was awarded a total of $2,815,829.51. These amounts were doubled per the Consulting Agreement when FRI failed to pay within 30 days.

FRI's efforts to vacate the Arbitration Award failed. The federal district court confirmed the Arbitration Award on July 31, 2012. The Arbitration Award is final.

**B.    Postpetition events**

Debtor filed his chapter 7 bankruptcy case on December 9, 2011. He listed his 100% ownership interest in FRI in his Schedule B with a value of $0. He also listed FRI's debts owed to RRC and Hackney in his Schedule F.

Appellees filed their first amended complaint ("FAC") against Debtor on July 31, 2012, seeking to except the Arbitration Award debt from discharge under § 523(a)(4) – for defalcation while acting in a fiduciary capacity – and § 523(a)(6).[8] Debtor's answer denied generally Appellees' allegations.

---

[8] The original complaint for these same claims was filed on March 19, 2012.

-13-

### 1. Appellees' motion for summary judgment and Debtor's cross-motion for summary judgment[9]

#### a. The initial briefing on the cross-motions

Appellees moved for summary judgment on their § 523(a)(4) and (a)(6) claims on April 15, 2013, on the basis of issue preclusion, contending that Debtor was precluded from relitigating the arbitrator's findings ("MSJ"). Appellees contended that privity — an element for purposes of issue preclusion — was the basis for which the bankruptcy court could impose personal liability for the Arbitration Award on Debtor.

Even though Appellees had pleaded in the FAC a claim under § 523(a)(4) based on Debtor's alleged defalcation, they now argued that the Arbitration Award established a § 523(a)(4) claim for embezzlement.[10] Appellees contended the following findings by the arbitrator supported their claims:

- that Debtor actively identified, sought out and expressly induced the Alaska lawyers for his clients' opponents to purchase the confidential documents for use against his clients;

- that Debtor had demonstrated awareness that the documents were proprietary and that his acts were wrongful by the extraordinary lengths to which he and his brother went to avoid detection of the fact that they had transferred those documents to those opponents at all. Such efforts included:

---

[9] The parties filed no less than 25 briefs in connection with their cross-motions for summary judgment, Appellees' motion for leave to amend the FAC and Debtor's motion to dismiss Appellees' second amended complaint. We focus on those issues still relevant to this appeal.

[10] Appellees conceded that a fund-raiser/client relationship might not rise to a level of a formal fiduciary relationship needed to support a finding of "defalcation while acting in a fiduciary capacity." Embezzlement, on the other hand, does not require a fiduciary relationship between the parties. Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1760 (2013).

-14-

- setting up a bogus claim to attorney-client privilege to shield the transfer, by including in the discussions an illogical request that Alaskan lawyers represent FRI in an arbitration in Los Angeles under California law;

- falsely testifying that they contacted those Alaskan attorneys solely for the purpose of obtaining such representation, or a contribution to their fight against now-common opponents;

- meeting those lawyers surreptitiously, without FRI's clients' knowledge or permission, and transferring the client documents to them for $50,000; and

- falsely testifying (i) that Debtor never transferred the documents to the clients' opponents, (ii) that they had no knowledge how those documents came to appear as exhibits to the APOC Complaint, and (iii) that Debtor had never agreed to become a consultant for the Pebble parties.

Appellees contended the awards for attorney's fees and expenses and punitive damages were also excepted from discharge.[11]

Debtor opposed the MSJ. He disputed Appellees' privity argument as a means to hold him personally liable for the Arbitration Award. Alternatively, Appellees had not pleaded a claim for embezzlement in the FAC, but rather for defalcation. Thus, argued Debtor, they could not have summary judgment on an unpleaded claim. Debtor's statement of genuine issues filed in support of his opposition did not respond to Appellees' forty-three proffered uncontroverted facts as required under Local Rule 7056-1(b)(2), but rather raised thirty separate issues of his own that he believed were in dispute.

In reply, Appellees noted that none of their forty-three

_____

[11] Appellees conceded that only the single award of damages of $4,444,806.51 was nondischargeable as opposed to the doubled amount of $8,889,613.02, since the doubling was the result of FRI's nonpayment within 30 days as required under the Consulting Agreement and not the result of Debtor's tortious conduct.

proffered uncontroverted facts had been disputed by Debtor. As for embezzlement, Appellees argued they had pleaded all of the facts on which they now based their embezzlement claim in the original complaint and FAC, even though they had not specifically alleged that the facts showed "embezzlement" under the alternative ground set forth in § 523(a)(4). Appellees argued, under the rule of notice pleading, that the same alleged facts could constitute embezzlement would not have been a surprise to Debtor's experienced bankruptcy counsel.

At the first hearing on the MSJ, the bankruptcy court decided to defer ruling on it and to grant Debtor's request for more time for limited discovery, considering the large dollar amount being sought against him and the parties' dispute regarding privity and the applicability of issue preclusion.

After taking further discovery (depositions of Hackney, Gillam and Jameson), Debtor filed his own motion for summary judgment and statement of uncontroverted facts containing 112 proffered facts ("Cross-MSJ"). Debtor contended he was entitled to summary judgment on Appellees' claim under § 523(a)(4) for defalcation in a fiduciary capacity, a legal theory which Appellees were no longer pursuing. Debtor contended he was also entitled to summary judgment on Appellees' § 523(a)(6) claim; Appellees had provided no evidence that it was Debtor's specific intention to cause the harms alleged by Appellees. At best, argued Debtor, the arbitrator's findings established only a deliberate act of turning over documents which eventually led to

-16-

the APOC Complaint which "allegedly"[12] harmed RRC and Hackney's business.  Debtor also contended he was entitled to summary judgment because no Appellee could identify any actions by Debtor that caused them harm and no evidence existed to support recovery.  At minimum, Debtor contended he was entitled to summary judgment on all claims as to Hackney because Hackney's deposition testimony demonstrated that the dischargeability action was proceeding without his knowledge or involvement.

Appellees opposed the Cross-MSJ, responding to each of Debtor's 112 proffered uncontroverted facts.  Appellees argued that Hackney's involvement, or lack thereof, in the dischargeability action did not matter; his underlying claims against Debtor at issue had already been litigated to a final judgment.  As for Debtor's assertion that no Appellee could identify any actions by Debtor that caused them harm, the action by Debtor — selling his clients' documents to his clients' opponents for use against them for $50,000 — had been litigated, adjudicated, found to have happened, and confirmed in a final judgment.  Moreover, much evidence existed to support Appellees' claims:  the same evidence that was submitted in the arbitration.  Nonetheless, Debtor was still stating, under oath, things already found to constitute perjury by him, or that were opposite of what the evidence showed and what was adjudicated:  (1) that he only contacted the Alaskan attorneys for representation in the

---

[12]  Debtor continues to use the words "alleged" or "allegedly" throughout his brief on appeal.  However, with respect to findings made by the arbitrator, those findings are no longer "alleged" but proven and are final and cannot now be disputed.  Neither can Debtor dispute the uncontroverted facts established in the summary judgment proceeding before the bankruptcy court.

arbitration; (2) that he never served as a consultant for Singer or the Pebble parties; and (3) that he never released documents designated as confidential. Appellees contended that Debtor was not entitled to summary judgment on either claim in the FAC, because the evidence clearly established both claims, particularly Debtor's intent to injure.

In reply, Debtor disputed that issue preclusion applied: (1) the issues in the two proceedings were different; (2) the issues presented here were not actually litigated or necessarily decided in the arbitration; and (3) Debtor was not in privity with FRI.

### b. "Seven question" briefing for the cross-motions and hearing

During the proceedings on the cross-motions, the bankruptcy court posed seven questions to the parties and directed further briefing on them before ruling. Those briefs were filed.

A hearing on the seven questions was held on February 19, 2014. There, the bankruptcy court raised the issue of Debtor's failure to respond to Appellees' forty-three proffered uncontroverted facts. The court and counsel for the parties then proceeded to review all forty-three proffered facts and determine which ones Debtor disputed. Subject to some amendments made on the record by Debtor's counsel (e.g., reference to acts by Debtor were reworded to read "Debtor on behalf of FRI" and some facts were reworded to say "the arbitrator found" as opposed to any admission by Debtor), the parties agreed and the court determined that forty-two of Appellees' forty-three proffered facts were

-18-

undisputed.[13] (The court later deemed the forty-third fact also undisputed.). Ultimately, the court decided that further briefing was necessary on the cross-motions based on the now uncontroverted facts.

### c. Briefing for the cross-motions based on joint uncontroverted facts

The parties filed their Joint Uncontroverted Facts ("JUF") for the cross-motions as agreed at the February 19 hearing. Curiously, the JUF contained a disclaimer by Debtor stating that he did not agree with any of Appellees' forty-three proffered facts and was reserving his right to dispute them with contrary evidence. The parties then filed four more briefs for the cross-motions based on the JUF. One major point of contention was whether Debtor could or could not be found personally liable for the Arbitration Award debt through either the doctrine of alter-ego or privity, or both, or neither.

### d. Crawford briefing

The bankruptcy court held another hearing on September 23, 2014, after the JUF briefs were filed. In response to Debtor's counsel's comment that Debtor was reserving his right to present contrary evidence to the JUF, as stated in the JUF, the court stated that it had already ruled that the facts in the JUF were undisputed at the February 19, 2014 hearing. The court then ordered further briefing based on Crawford v. Gould, 56 F.3d 1162, 1168 (9th Cir. 1995), which Debtor argued prevented the court from granting summary judgment to Appellees on their embezzlement claim

---

[13] Debtor's 112 proffered uncontroverted facts were deemed undisputed at a later hearing on September 23, 2014.

-19-

under § 523(a)(4), when no allegations of embezzlement were pleaded in the FAC.

In their opening Crawford brief, Appellees argued that the case was distinguishable, but in any event suggested they could seek leave to amend under Civil Rule 15(a) to add the embezzlement claim. Appellees announced their intent to move to amend the FAC, which could be heard before the final hearing on the cross-motions scheduled in February 2015.

### 2. Appellees' motion for leave to amend the FAC

Appellees moved to amend the FAC under Civil Rule 15(a)(2) on December 8, 2014, to add what they contended was the legal theory of embezzlement under § 523(a)(4), which was related to the same facts already pleaded. Appellees attached a copy of the proposed second amended complaint ("SAC").

Debtor opposed the motion for leave, arguing that it was impermissible in the Ninth Circuit to amend a complaint while a motion for summary judgment is pending. In addition, Appellees waiting 28 months before seeking leave to amend the FAC for a claim which they knew about constituted undue delay. Debtor argued he would be unduly prejudiced by Appellees amending at this late date; adding new claims would necessitate reopening discovery, which had closed 18 months ago, the filing of an answer and the revision of his Cross-MSJ to address the new grounds of the SAC, all of which would create more expense and delay.

In reply, Appellees argued that no "bright-line" rule existed in the Ninth Circuit that no amendments can be made to a complaint once a motion for summary judgment has been filed. Appellees further argued that no undue prejudice existed because the parties

-20-

had already litigated the test for embezzlement in their cross-motions, and the claim was first raised before Debtor had requested further time for discovery. In any event, no further discovery was needed because the asserted claim for embezzlement arose from the same exact transaction alleged to have constituted a "defalcation in a fiduciary capacity." In short, Appellees argued that given the nature of the specification Debtor demanded for the embezzlement claim and the extent to which the claim had already been litigated, it was more efficient to give Debtor the more specific pleading he insisted upon and remove that ground for objection or appeal going forward.

Determining that under Ninth Circuit authority it had discretion to grant leave to amend even with a summary judgment motion pending, the bankruptcy court granted Appellees' motion to amend their § 523(a)(4) claim for embezzlement. Debtor's counsel indicated that a new answer would be filed within 15 days. To give Debtor time to file anything else he felt necessary based on the SAC, the hearing on the cross-motions was continued to March 5, 2015.[14] An amended order granting leave to amend was entered on January 14, 2015.

### 3. Debtor's motion to dismiss the SAC

Rather than filing an answer, Debtor moved to dismiss the SAC ("MTD"). He contended the amendments made in the SAC exceeded the leave granted by the court. Appellees were allowed to amend only the embezzlement claim, yet they amended the § 523(a)(6) claim as

---

[14] On March 4, 2015, the bankruptcy court entered a tentative ruling stating that it would decide the pending MSJ, Cross-MSJ and MTD on the briefs. As a result, the final hearing was vacated.

well.  Second, the claims in the SAC were time barred.[15]  Finally, Debtor argued that Appellees had failed to present sufficient facts to establish embezzlement.

Appellees opposed the MTD, contending the allegations in the SAC did not go beyond assertions made in the FAC and in the MSJ.

**4.  More briefing on the cross-motions based on the SAC**

Meanwhile, the parties filed supplemental briefing for the cross-motions based on the SAC.  Debtor made the following arguments:  (1) that the MSJ was now moot because it was based on the FAC, which was now moot due to Appellees' filing of the SAC; (2) that the SAC raised issues on which Debtor had not been permitted to take discovery; (3) that Appellees failed to provide sufficient uncontroverted facts to establish either a § 523(a)(4) or (a)(6) claim; (4) that Appellees had failed to show that issue preclusion, particularly privity, applied to the Arbitration Award; (5) that even if the MSJ could proceed and established a viable theory for summary judgment, Appellees' damages were limited to $50,000, the amount awarded for misappropriation of trade secrets.

Appellees argued that while some courts have held that amending a complaint "ordinarily" moots a motion for summary judgment noticed on the prior operative complaint, "ordinarily" does not mean "necessarily."  Debtor had not cited any case that provides an absolute bar to a court's consideration of a summary judgment motion after an amended complaint has been filed.  As for

---

[15]  The bankruptcy court ruled against Debtor on the statute of limitations argument.  Debtor does not dispute that ruling on appeal.

additional discovery, Debtor had never identified any specific discovery he would need to undertake despite being given several opportunities to do so.

After the bankruptcy court took the MSJ, Cross-MSJ and MTD under submission, the parties filed seven additional briefs.

**5. Bankruptcy court's ruling on the MSJ, Cross-MSJ and MTD**

The bankruptcy court entered its Memorandum Decision, Order and Judgment respecting the MSJ, Cross-MSJ and MTD on April 1, 2016. As a threshold matter, the court ruled that Appellees' MSJ did not become moot because of the filing of the SAC.

Next, the court determined that issue preclusion applied to the Arbitration Award, ruling that Debtor was in privity with FRI, and that the arbitrator's findings combined with the uncontroverted facts established the elements for Appellees' claim for embezzlement under § 523(a)(4) and claim for a willful and malicious injury under § 523(a)(6). The court further determined that because damages under the Arbitration Award were based on Debtor's malicious and fraudulent conduct, the amounts awarded to RRC and Hackney representing actual damages, including punitives, but not the doubled amounts due to late payment, were nondischargeable under § 523(a)(4) and (a)(6).

Accordingly, because Appellees were entitled to summary judgment as a matter of law, Debtor's Cross-MSJ was denied. Because the SAC pleaded sufficient facts upon which relief for embezzlement could be granted, the court also denied Debtor's MTD. An exception to discharge judgment was entered in favor of RRC for $1,628,977.00 and in favor of Hackney for $2,815,829.51. This timely appeal followed.

-23-

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.[16]

## III. ISSUES

1. Did the bankruptcy court abuse its discretion in granting Appellees leave to amend the FAC to include the embezzlement claim?

2. Did the bankruptcy court err in determining that issue preclusion was available, and did it abuse its discretion in applying it to the Arbitration Award?

3. Did the bankruptcy court err in granting summary judgment to Appellees determining that the debt was excepted from discharge under § 523(a)(4) and (a)(6)?

4. Did the bankruptcy court err in denying the Cross-MSJ or the MTD?

## IV. STANDARDS OF REVIEW

We review for abuse of discretion the bankruptcy court's

_____

[16] Debtor also appeals the bankruptcy court's decision to deny his Cross-MSJ and his MTD. The Panel lacks jurisdiction to hear appeals from interlocutory orders, such as an order denying a motion to dismiss an adversary proceeding, Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc., 811 F.2d 1209, 1214 (9th Cir. 1987), and an order denying a motion for summary judgment, Comsource Indep. Foodservice Cos., Inc. v. Union Pac. R.R. Co., 102 F.3d 438, 441-42 (9th Cir. 1996). However, because the bankruptcy court decided these matters conclusively in its Memorandum Decision, Order and Judgment, the interlocutory orders denying the Cross-MSJ and MTD merged into the final appealable order granting the MSJ. The Panel may review on appeal all earlier interlocutory orders that merge in the final appealed order. Fear v. U.S. Tr. (In re Ruiz), 541 B.R. 892, 895 n.7 (9th Cir. BAP 2015). See also Am. Ironworks & Erectors Inc. v. N. Am. Constr. Corp., 248 F.3d 892, 897-98 (9th Cir. 2001) ("A necessary corollary to the final judgment rule is that a party may appeal interlocutory orders after entry of final judgment because those orders merge into that final judgment.").

-24-

decision whether to grant leave to amend the complaint. See Zadrozny v. Bank of N.Y. Mellon, 720 F.3d 1163, 1167 (9th Cir. 2013); Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

We review summary judgment determinations de novo. See Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014); Shahrestani v. Alazzeh (In re Alazzeh), 509 B.R. 689, 692-93 (9th Cir. BAP 2014). In reviewing a bankruptcy court's determination of an exception to discharge, we review its findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

We review de novo the preclusive effect of a judgment; whether issue preclusion is available is a mixed question of law and fact. Stephens v. Bigelow (In re Bigelow), 271 B.R. 178, 183 (9th Cir. BAP 2001). If issue preclusion is available, the bankruptcy court's decision to apply it is reviewed for abuse of discretion. Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez), 367 B.R. 99, 104 (9th Cir. BAP 2007). Under that standard, we reverse where the bankruptcy court applied an incorrect legal rule or where its application of the law to the facts was illogical, implausible or without support in inferences that may be drawn from the record. Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253, 1258 (9th Cir. 2010) (citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

## V. DISCUSSION

Resolution of this appeal requires the Panel to apply several legal standards to the bankruptcy court's decision: summary

-25-

judgment, issue preclusion and exception to discharge under § 523(a)(4) and (a)(6). In particular, we must determine if the Arbitration Award is entitled to preclusive effect and, if so, whether any disputed material facts remained which prevented the bankruptcy court from granting summary judgment to Appellees for an exception to discharge under either § 523(a)(4) or (a)(6).

**A.  Even if the bankruptcy court had not granted leave to amend the FAC to include the embezzlement claim, Appellees were entitled to summary judgment on their § 523(a)(6) claim.**

Debtor contends the bankruptcy court should have denied leave to amend the FAC because the MSJ and Cross-MSJ had been pending for years and that the liberal amendment rules were not intended to allow a party to circumvent the effects of summary judgment by amending the complaint, citing Acri v. International Association of Machinists & Aerospace Workers, 595 F. Supp. 326, 334 (N.D. Cal. 1984). Debtor also cites Ninth Circuit authority, where the court has expressed that a pending summary judgment motion and completed discovery weigh heavily against allowing leave to amend. M/V Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1492 (9th Cir. 1983); Schlacter-Jones v. Gen. Tel. of Cal., 936 F.2d 435, 443 (9th Cir. 1991), overruled on other grounds by Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 692 (9th Cir. 2001).

We disagree with Debtor. The Ninth Circuit has affirmatively held that amendments for the purpose of adding new claims are clearly permitted by Civil Rule 15 **and** may be introduced and considered during the pendency of a motion for summary judgment. William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1053 n.68 (9th Cir. 1981) (citing 6 Moore's Federal

-26-

Practice ¶ 56.10 (2d ed. 1976)). However, we need not reach the merits of the bankruptcy court's decision to grant leave to amend the FAC to include the embezzlement claim, because the FAC supported Appellees' claim for a willful and malicious injury under § 523(a)(6).[17] As we are not reaching the merits on the bankruptcy court's decision to grant leave to amend the FAC, we are also not reaching the merits of its decision respecting the § 523(a)(4) claim, even though sufficient facts and conclusions by the court exist in the record to satisfy the elements of an embezzlement claim.

**B. The bankruptcy court did not err in determining that issue preclusion was available or abuse its discretion in applying it to the Arbitration Award.**

**1. Issue preclusion standards**

The doctrine of issue preclusion applies to dischargeability proceedings under § 523(a). <u>Grogan v. Garner</u>, 498 U.S. 279, 284 n.11 (1991). The question of whether California or federal issue preclusion law applied to the Arbitration Award was a subject of much debate because the award, although based entirely on state

---

[17] We reject Debtor's argument that he was denied the opportunity to file an answer to the SAC. Debtor chose instead to file the MTD. We also reject Debtor's contention that the bankruptcy court erred in granting the MSJ because the MSJ was rendered moot by the filing of the SAC, citing <u>Mink v. Suthers</u>, 482 F.3d 1244, 1254 (10th Cir. 2007), and other out-of-circuit cases. The bankruptcy court rejected this argument as "hyper-technical" and "lack[ing] legal support." Mem. Dec. at 10. Specifically, the court noted that Debtor had not cited, nor had the court found, any binding authority that required, as a per se rule, the court to treat Appellees' MSJ as moot because of the filing of the SAC. <u>Id.</u> at 9. In any event, once the SAC was filed, the parties engaged in further briefing and filed no less than nine briefs for the cross-motions based on the SAC. Thus, Debtor had more than sufficient opportunity to brief his defenses to Appellees' claims, whether based on the FAC or SAC.

-27-

law claims, had been affirmed by a federal district court conducted under diversity jurisdiction. Ultimately, the bankruptcy court decided that California law applied; we agree.

In California, issue preclusion prevents parties from relitigating issues already decided in prior proceedings. Lucido v. Super. Ct., 51 Cal. 3d 335, 341 (1990). Application of issue preclusion requires that: (1) the issue sought to be precluded must be identical to that decided in the former proceeding; (2) the issue must have been actually litigated in the former proceeding; (3) the issue must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom issue preclusion is sought must be the same as, or in privity with, the party to the former proceeding. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1245 (9th Cir. 2001) (citing Lucido, 51 Cal. 3d at 341). The party asserting preclusion bears the burden of establishing the threshold requirements. Id.

Even if all five requirements are satisfied, however, California places an additional limitation on issue preclusion: courts may give preclusive effect to a judgment if it would be fair and consistent with sound public policy to impose issue preclusion in the particular setting. Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 824-25 (9th Cir. BAP 2006). Under this sixth element, when applying issue preclusion based on a confirmed arbitration award, the court must examine "whether the underlying arbitration followed basic elements of adjudicatory procedure and was, thus, 'adjudicatory in nature.'" Id. at 828 (quoting Kelly v. Vons Cos., 67 Cal. App. 4th 1329, 1336 (1998)).

-28-

Finally, in the case where issue preclusion is applied offensively to preclude a defendant from relitigating an issue the defendant previously litigated and lost, the courts consider whether the party against whom the earlier decision is asserted had a "full and fair" opportunity to litigate the issue. Roos v. Red, 130 Cal. App. 4th 870, 879 (2005).

## 2. Analysis

Debtor does not challenge that the confirmed Arbitration Award was final and on the merits, or that the issues were necessarily decided in the arbitration proceeding. He takes issue primarily with the bankruptcy court's finding of privity, the identity of issues, whether the issues were actually litigated and whether the court's application of issue preclusion was fair and consistent with public policy.

### a. Whether the arbitration proceeding was adjudicatory in nature

As a threshold matter, the bankruptcy court considered whether the arbitration proceeding was sufficiently adjudicatory in nature for issue preclusion to apply to the Arbitration Award — part of the sixth element under California law. After thoroughly analyzing the issue, which was not raised by the parties, the court determined that the arbitration proceeding was sufficiently adjudicatory in nature to give issue preclusive effect to the arbitrator's findings, assuming the other five elements of issue preclusion were also satisfied.

On appeal, Debtor contends the bankruptcy court erred in determining that the arbitration proceeding was sufficiently adjudicatory in nature to give issue preclusive effect to the

-29-

arbitrator's findings for a variety of reasons: (1) it was not a judicial-like proceeding; (2) the court failed to consider whether the burdens of proof applied by the arbitrator to the claims in arbitration were identical to standards for § 523; (3) the arbitrator did not apply any legal rules to the facts in making his determinations on the various claims at issue; and (4) the arbitrator made sua sponte determinations of conversion and misappropriation. Except for the last issue, Debtor never raised any of these arguments before the bankruptcy court in his multitude of briefs opposing the MSJ. Therefore, we will not address them on appeal. See Ezra v. Seror (In re Ezra), 537 B.R. 924, 932 (9th Cir. BAP 2015) ("Ordinarily, federal appellate courts will not consider issues not properly raised in the trial courts.").

As for the arbitrator's "sua sponte" determination that the facts established claims for conversion and misappropriation of trade secrets, those claims were raised by Appellees in their closing briefs in the arbitration and opposed by Debtor in his unsuccessful efforts to vacate the Arbitration Award. But more importantly, Debtor's challenges to the underlying determinations made by the arbitrator, which he makes frequently throughout his appeal brief, come too late and before the wrong court. See Molina v. Seror (In re Molina), 228 B.R. 248, 250 (9th Cir. BAP 1998) (confirmation of an arbitration award is a final judgment, even if clearly erroneous, and must be given full faith and credit by federal courts). Accordingly, for this and the reasons set forth in the Memorandum Decision, the bankruptcy court did not err in finding that the arbitration proceeding was sufficiently

-30-

adjudicatory in nature for issue preclusion to apply to the Arbitration Award.

### b. Whether Debtor was in privity with FRI and whether Debtor had a full and fair opportunity to litigate

Under California law, in the claim and issue preclusion context, "privity" refers:

> [T]o a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel. "This requirement of identity of parties or privity is a requirement of due process of law." "Due process requires that the nonparty have had an identity or community of interest with, and adequate representation by, the . . . party in the first action. The circumstances must also have been such that the nonparty should reasonably have expected to be bound by the prior adjudication . . . ."

Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n, 60 Cal. App. 4th 1053, 1069-70 (1998) (internal citations omitted).

The bankruptcy court found that Debtor was in privity with FRI. Based on the undisputed facts, the court found that at the time of FRI's retention under the Consulting Agreement and throughout the arbitration proceeding, Debtor had a sufficiently close relationship with FRI, because he was the president, sole shareholder and sole employee of FRI. In addition, Debtor worked from his home to carry out FRI's business and offered no evidence in arbitration that he maintained any corporate formalities. Moreover, as a due process matter, the bankruptcy court found that Debtor, who had counsel throughout the proceeding (in fact, his own brother), should reasonably have expected to be bound by the

-31-

Arbitration Award. First, Appellees had brought intentional tort claims against FRI. Second, under California law, corporate officers are liable to persons they tortiously injure even though the corporation may be liable, and an officer is not relieved of personal liability for misappropriating property of another merely because he or she did it on behalf of his or her corporate principal.

As further support for finding Debtor was in privity with FRI, which somewhat overlaps with the fairness and public policy considerations found in element six because Debtor was a nonparty to the arbitration,[18] the bankruptcy court found that Debtor had a full and fair opportunity to litigate in the arbitration. The arbitration proceeding was conducted in a judicial-like adversary proceeding before a retired judge that featured at least seven status conferences, motions in limine, taking of testimony of witnesses (including Debtor) with cross-examination, a briefing schedule for written closing arguments, the submission of deposition transcripts, a twenty-six page final award that included detailed findings of fact and conclusions of law, and citations to witness testimony under oath. Further, nothing in the record suggested that Debtor had no incentive to vigorously litigate the issues in the prior action. To the contrary, it was Debtor, through FRI, who initiated the arbitration proceeding.

_____

[18] See Nein v. HostPro, Inc., 174 Cal. App. 4th 833, 846 (2009) (nonparty should reasonably be expected to be bound if he had in reality contested the prior action even if he did not make a formal appearance, for example, by controlling it; privity appertains "against one who did not actually appear in the prior action . . . where the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for a nonparty").

-32-

Moreover, Debtor had an opportunity to defend his interests and had consented to the arbitration through his wholly owned entity, FRI. Finally, the court found that even though Debtor was a non-party as a matter of form, he was a signatory party as a matter of substance; no one besides Debtor and his attorney were present at the arbitration proceeding on FRI's behalf.

Debtor first contends that the bankruptcy court's decision that he was in privity with FRI is wrong because (1) the court relied exclusively on facts derived from the Arbitration Award to find privity, and (2) reliance on the Arbitration Award is insufficient because the arbitrator declined to make any finding of alter-ego, and so Debtor's relationship to FRI was neither litigated nor established in the arbitration. Debtor's blatant misrepresentation of the record is alarming. The bankruptcy court did not rely exclusively on facts derived from the Arbitration Award to find privity (which are final in any event); it relied almost entirely on the uncontroverted facts to determine privity, which were supported by Debtor's deposition, his resume and his bankruptcy schedules. Secondly, Debtor's relationship to FRI did not have to be litigated or established in the arbitration for the bankruptcy court to determine whether privity applied to Debtor in this proceeding.

In arguing that the bankruptcy court failed adequately to consider due process, Debtor contends he did not have, and should not have had, any expectation whatsoever to be bound by the Arbitration Award; he was not a party to the Consulting Agreement, and the arbitrator refused to hold him personally liable for the Arbitration Award against FRI without a litigated finding of

-33-

alter-ego. The standard is not whether Debtor had **any** expectation to be bound by the Arbitration Award, but rather whether he had a **reasonable** expectation to be bound. The bankruptcy court's findings as to Debtor's incentive to litigate on behalf of FRI and his control over that litigation, which we do not find clearly erroneous, belie Debtor's argument. Further, Debtor is sophisticated enough to know that he cannot commit intentional torts and perjury behind the shield of his corporation without encountering adverse consequences. His reasonable expectation to be bound by the Arbitration Award is also evidenced by his immediate bankruptcy filing after the arbitration had concluded and the fact that he listed the Arbitration Award debt in his bankruptcy schedules. Finally, as noted above, a finding of alter-ego was not needed in this proceeding to find Debtor personally liable for the Arbitration Award like it was in the arbitration proceeding.

Accordingly, the bankruptcy court did not clearly err in finding that Debtor was in privity with FRI.

### c. Whether the issues are identical

"The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." Lucido, 51 Cal. 3d at 342 (citing People v. Sims, 32 Cal. 3d 468, 485 (1982)). To determine whether issues in prior and subsequent proceedings are identical for purposes of applying issue preclusion, a court examines whether the requirements for proving the issue at stake in the subsequent proceeding "closely mirror" requirements of proving issues presented in the prior

-34-

action. See Nourbakhsh v. Gayden (In re Nourbakhsh), 162 B.R. 841, 844 (9th Cir. BAP 1994).

Debtor raises a host of arguments here, but his primary complaint is that the issues in the adversary proceeding were not identical to those in the arbitration, and the arbitrator did not make any express findings of Debtor's intent, fraud or malice to provide a basis for the bankruptcy court's determination that the issues in the arbitration were identical to those in the adversary proceeding. We disagree.

The bankruptcy court determined that the Arbitration Award included factual findings that were identical to the elements required to establish willful and malicious injury under § 523(a)(6). First, the award and uncontroverted facts established that Debtor made multiple implied threats to Appellees about revealing the confidential documents. The court determined that this factual finding, combined with other undisputed facts proving that Debtor later sold those confidential documents to Singer, demonstrated that Debtor had a "subjective motive to inflict injury" to Appellees, which was identical to the issue of whether Debtor acted willfully. The court further determined that the Debtor's act of misappropriating FRI's former clients' documents, which was the causal event that contributed to the loss of grant funds of $386,300 by RRC and the $1,070.301.68 in lost revenues to Hackney, was identical to the issue of whether Debtor's wrongful and intentional act necessarily caused injury to Appellees.

Here, Debtor argues that in determining whether the issue of his willfulness was identical to the issues in the arbitration,

the bankruptcy court pointed only to uncontroverted fact 21, which concerned Debtor's "alleged" email threats about revealing confidential RRC documents and was based exclusively on the self-serving Exhibit X — the email between counsel for Appellees. Not only does Debtor fail to state why this was erroneous if true, it is not true. In determining that Debtor's willfulness was at issue in the arbitration, the bankruptcy court relied not only on uncontroverted fact 21, but also on the other undisputed fact that Debtor later sold the confidential documents to Singer, which confirmed Debtor's subjective intent to injure Appellees in the precise way he did. In addition, Debtor fails to mention his October 1 and October 30 emails to Appellees, wherein he made similar threats to expose his former clients' confidential documents to their opponents.

Accordingly, we see no clear error in the bankruptcy court's finding that the issues were identical. While the causes of actions alleged may have been different in the arbitration — not willful and malicious injury — the factual allegations respecting Debtor's conduct were identical.

**d.    Whether the issues were actually litigated**

An issue is "actually litigated" when the issue was raised, actually submitted for determination, and determined. Baker v. Hull, 191 Cal. App. 3d 221, 226 (1987). The bankruptcy court found that based on the Arbitration Award's detailed findings of fact as to Debtor's conduct (whether his misappropriation of RRC's confidential documents and subsequent perjury about that conduct constituted embezzlement or inflicted a willful and malicious injury on Appellees) and the other arbitration proceeding

-36-

documents presented by the parties, the issues were actually litigated in the prior proceeding.

Debtor contends that nothing in the record demonstrates that the required elements for embezzlement or willful and malicious injury were ever considered, applied or actually litigated. In addition, Debtor contends that his intent or fraud was not litigated in the arbitration.

The elements of a state law cause of action are rarely identical to those proving a claim under § 523(a)(4) or (a)(6). However, issue preclusion will apply if the findings of fact actually and necessarily litigated in the arbitration meet the bankruptcy-law definitions for those claims. The bankruptcy court determined that the arbitrator's findings met the bankruptcy-law definitions for willful and malicious injury, as stated more fully above, which we conclude is correct. Thus, the bankruptcy court did not err in determining that the identical issues were actually litigated in the prior proceeding.

Therefore, because all of the necessary elements for applying issue preclusion to the Arbitration Award were met here, the bankruptcy court did not err in determining that issue preclusion was applicable to the Arbitration Award.

**C.  The bankruptcy court did not err in granting summary judgment to Appellees for their claim under § 523(a)(6).**

**1.  Summary judgment standards**

Summary judgment may be granted by the trial court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

-37-

law."  Civil Rule 56(a), as incorporated by Rule 7056; Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 707 (9th Cir. 2008). Summary judgment should not be entered when there are disputes over facts that may affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The moving party bears the initial burden of showing that no material factual dispute exists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  When ruling on a motion for summary judgment, a court must view all the evidence in the light most favorable to the nonmoving party. Cty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

### 2. The elements for a willful and malicious injury under § 523(a)(6) were met.

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."  Both willfulness and maliciousness must be proven in order to apply § 523(a)(6). Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010).  "A 'willful' injury is a 'deliberate or intentional **injury**, not merely a deliberate or intentional **act** that leads to injury.'"  In re Barboza, 545 F.3d at 706 (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (emphasis in original)).  The willful injury requirement under § 523(a)(6) "is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct."  In re Ormsby, 591 F.3d at 1206.  "A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is

-38-

done without just cause or excuse. Malice may be inferred based on the nature of the wrongful act." Id. at 1207.

Debtor's primary contention here is that his intent was not litigated or determined in the arbitration, and Appellees had failed to present any evidence of Debtor's intent here or in the arbitration. Apparently, Debtor needs to review the record and the uncontroverted facts.

The undisputed facts established that Debtor made various threats implying he would reveal RRC's documents if Appellees refused to settle his fee dispute arising from the Consulting Agreement to his satisfaction. On March 1, 2009, Debtor sold various RRC documents, including donor lists, bank account information and contact lists to Singer. In sum, Debtor threatened RRC with harm in an attempt to coerce RRC to pay him, and then carried through on his threats when Appellees did not cooperate. On these facts, the bankruptcy court determined that Debtor acted willfully within the meaning of § 523(a)(6) because he had a "subjective motive to inflict injury." Mem. Dec. at 28.

The undisputed facts showed that: (1) Debtor was provided with the documents during his retention by RRC to enable him to perform his contractual duties; (2) Jameson had specifically discussed with Debtor that the subject documents were highly confidential; (3) RRC designated its membership and donor information as confidential to staff and on its website; (4) FRI had contracted with RRC to keep the documents in confidence and to use the documents only in connection with the services to be provided under the contract; (5) Debtor, as a professional political consultant, considered himself ethically bound to not

-39-

reveal confidential information obtained during his professional relationship; and (6) despite all of the foregoing, Debtor sold the confidential documents for $50,000 to Singer, who then used those confidential documents in the APOC Complaint against RRC, Hackney, Gilliam and others. On these facts, the bankruptcy court determined that Debtor's act was wrongful. Mem. Dec. at 29.

The undisputed facts showed that Debtor's act of selling the confidential documents to Singer was done intentionally. Debtor made threats implying he would reveal RRC's information and that if his terms for settlement were not accepted, dire consequences would follow. On these facts, the bankruptcy court found that Debtor's wrongful act was intentional.

The undisputed facts further showed that Debtor's act of selling the confidential documents to Singer necessarily caused injury. The arbitrator found an "inescapable inference" that the APOC Complaint, which incorporated the confidential documents and public investigation, was a causal event that contributed to the cancellation of $386,300 in grant funds to RRC and loss of clients and revenues to Hackney, for which the arbitrator awarded $1,070,301.68. In addition, the record reflects that the prior APOC complaint Amodio filed against Appellees was unsuccessful, and that the second one resulted in an investigation of Appellees **only** because of the confidential RRC documents Debtor sold to Singer. Accordingly, the bankruptcy court found that Debtor's act necessarily caused injury to Appellees.

Finally, the bankruptcy court determined that Debtor's act of selling FRI's former clients' confidential documents to their political opponents for use against them was done without just

-40-

cause or excuse. Although Debtor portrayed himself as an altruistic whistle blower in the arbitration, the arbitrator found that Debtor and his attorney brother Allan should have known that sharing documents with counsel for clients adverse to FRI's former clients was not a report to the proper authorities, and certainly not for a fee of $50,000 (although Debtor wanted $450,000). The bankruptcy court also found that Debtor's perjury regarding his act of selling the documents evidenced that he himself did not believe he had a just cause or excuse for doing so.

In short, Debtor sold his former clients' confidential materials to their Pebble Mine opponents, and he did so to help the Pebble Mine parties in their efforts to take out Appellees in their role as the organized opposition to the Pebble Mine. Debtor articulated that plan both in written communications to Appellees and to the Alaska attorneys representing the Pebble parties, thereby documenting his intent to injure Appellees in precisely that manner. He then repeatedly testified, falsely, that he had never transferred those materials at all. Clearly, the undisputed facts show that Debtor inflicted a willful and malicious injury on Appellees.

Accordingly, with no genuine issues of material fact in dispute and the elements satisfied, the bankruptcy court did not err in granting summary judgment to Appellees on their § 523(a)(6) claim. We now consider whether the damages awarded were appropriate.

**3. The bankruptcy court did not err in determining that all damages awarded to Appellees in the Arbitration Award were nondischargeable.**

The bankruptcy court determined that all of the damages the

-41-

arbitrator awarded to RRC and Hackney, including punitive damages, were nondischargeable under § 523(a)(4) and (a)(6), because they flowed from Debtor's malicious and fraudulent conduct, which had been actually litigated and was necessary to the Arbitration Award.

To recap, the arbitrator awarded RRC: (1) the $50,000 FRI received for its misappropriation of RRC's confidential documents; (2) $3,169 RRC spent in attorney's fees to redact documents in trying to salvage confidentiality after they were delivered to APOC; (3) $386,330 for a lost grant caused by the impact of the APOC Complaint and public investigation; and (4) $156,804 for attorney's fees and $32,704 for expenses incurred in the arbitration as a prevailing party on the Consulting Agreement. Hackney was awarded: (1) $1,011,681.68 for lost clients and revenues "resulting from the APOC Complaint with its FRI documents" and $56,120.30 for the attorney's fees incurred in responding to the APOC investigation; and (2) $675,758.76 for attorney's fees and $69,768.77 for expenses incurred in the arbitration as a prevailing party on the Consulting Agreement.

It is clear by the arbitrator's findings that the course of misconduct by Debtor — his selling of RRC confidential documents which resulted in the APOC Complaint and investigation and his lying about his actions — was the direct cause of Appellees' actual damages. Thus, these damages are nondischargeable. Cohen v. de la Cruz, 523 U.S. 213, 220 (1998). Likewise, the attorney's fees and expenses awarded to RRC and Hackney for the arbitration proceeding, which were awardable based on the Consulting

-42-

Agreement, are part of the nondischargeable debt.[19] Id. at 223. Cohen stands for the general proposition that any liability duly imposed as a direct, but-for result of the defendant's nondischargeable conduct constitutes a nondischargeable debt, including attorney's fees and costs. See also Suarez v. Barrett (In re Suarez), 400 B.R. 732, 738-39 (9th Cir. BAP 2009) (applying Cohen to affirm bankruptcy court's determination under § 523(a)(6) that attorney's fees and costs were nondischargeable, even though no compensatory damages were awarded); Roussos v. Michaelides (In re Roussos), 251 B.R. 86, 94 (9th Cir. BAP 2000) (attorney's fees and costs, if awardable under state law, are also part of the nondischargeable debt).

The arbitrator also awarded RRC and Hackney each $1,000,000 for punitive damages, "arising from the tort causes of action, and perjury of FRI/Kaplan." For an award of punitive damages in California under Cal. Civ. Code § 3294(a),[20] clear and convincing evidence of either malice, oppression or fraud must be presented. Debtor contends the Arbitration Award is devoid of any express findings of malice, oppression or fraud, and none of these were

---

[19] The attorney's fees clause in the Consulting Agreement is very broad, to include an award of fees and costs to the prevailing party not only for proceedings to enforce or interpret the contract, but also "to resolve any other dispute or controversy between the Parties[.]"

[20] Cal. Civ. Code § 3294(a) provides:

In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

-43-

elements of any claims determined in the award. In Plyam v. Precision Development, LLC (In re Plyam), 530 B.R. 456, 470 (9th Cir. BAP 2015), we acknowledged that a question may arise when issue preclusion is based solely on a California punitive damages award and the basis for the award is unclear. Here, however, we have no such concerns. The arbitrator based the award on nondischargeable tort claims. His findings make clear that Debtor's actions were intentional and not merely reckless or negligent. Thus, we can infer that he based the punitive damages award on malice or fraud of the type that supports section 523(a)(6) nondischargeability. In re Molina, 228 B.R. at 250-51 (if legal test for award of punitive damages for malice, oppression or fraud is the same legal test as would be applied under § 523(a)(6), then punitive damages are given preclusive effect).

Accordingly, the bankruptcy court did not err in giving preclusive effect to the Arbitration Award damages and determining that all were nondischargeable.

**D. The bankruptcy court did not err in denying the Cross-MSJ or the MTD.**

Because we conclude that Appellees were entitled to summary judgment as a matter of law on their § 523(a)(6) claim for a willful and malicious injury, we conclude that Debtor was not entitled to summary judgment. Alternatively, even if the bankruptcy court abused its discretion in allowing Appellees to amend the FAC, which we conclude it did not, their claim under § 523(a)(6) would stand even with the FAC as the operative complaint. Thus, it would still have been proper for the court to

-44-

deny Debtor's Cross-MSJ on that claim. Along this same vein, because the SAC alleged a plausible and timely claim for exception to discharge under § 523(a)(6), the court did not err in denying the MTD.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment entered under § 523(a)(6), and conclude that given this affirmance, it is unnecessary to reach the merits on the other issues.